1  GLANCY BINKOW & GOLDBERG LLP
   LIONEL Z. GLANCY (#134180)
2  EX KANO S. SAMS II (#192936)
3  LOUIS N. BOYARSKY (#263379)
   1801 Avenue of the Stars, Suite 311
4  Los Angeles, California 90067
5  Telephone: (310) 201-9150
   Facsimile:  (310) 201-9160
6  E-mail: info@glancylaw.com
7
8  *Attorneys for Plaintiff*
9
10              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
11

12  VIVIAN R. DULBERG,                    Case No. _____
13  Derivatively on Behalf of Herself     **SACV11-00351  JVS  (RNBx)**
    and All Others Similarly Situated,
14
15              Plaintiff,               **SHAREHOLDER DERIVATIVE
                                         COMPLAINT**
16       vs.
17  FRANCO PLASTINA, WILLIAM
    H. EVERETT, GREGORY S. RUSH,         DEMAND FOR JURY TRIAL
18  MARK A. FLOYD, RONALD W.
19  BUCKLY, HUBERT DE
    PESQUIDOUX, DAVID R. LAUBE,
20  CAROL G. MILLS, KRISH
    PRABHU, AND MICHAEL R.
21  RESSNER
22
23              Defendants,
24
    -and-
25
26  TEKELEC,
27
                Nominal Defendant.
28

                SHAREHOLDER DERIVATIVE COMPLAINT

**INTRODUCTION**

1.      Plaintiff, by and through her attorneys, brings this action derivatively on behalf of nominal defendant Tekelec ("Tekelec" or the "Company") and alleges upon personal knowledge as to herself and her own acts, and as to all other matters based upon the investigation conducted by her attorneys which included, among other things, a review of Securities and Exchange Commission ("SEC") filings, documents, analyst reports, news reports, press releases, and other publicly available information regarding the Company, as follows:

2.      This is a shareholder derivative action brought on behalf of the Company against the members of its Board of Directors ("Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties and other violations of the law that occurred from at least February 11, 2010 through August 5, 2010 ("Relevant Period").

3.      Defendant Tekelec is a global provider of communications network software. Throughout the Relevant Period, Defendants in their public fillings, press releases and communications with analysts touted the Company's sales growth in emerging markets generally, and on the Indian market in particular. For example, in a conference call with analysts, Chief Executive Officer ("CEO") and Director Franco Plastina ("Plastina") specifically referred to the Company's progress in the Indian and Brazilian markets saying that, *"our position in India and Brazil remains strong."*

4.      Defendants, however, had no reasonable basis for their positive statements about growth prospects in emerging markets, and when the truth was finally revealed, the Company suffered substantial injury. Indeed, Tekelec shares fell *nearly 20%* on May 6, 2010, after Defendants revealed in their 2010 first quarter earnings report that the Company's financial results were impacted by

regulations in India that would delay approximately $10 million worth of orders. Defendants, however, only revealed part of the difficulties that the Company was facing and continued to conceal the true scope of the problems impacting Tekelec's business.

5.     Sales growth in emerging markets continued to fail to materialize in the second quarter of 2010, as Tekelec's projected sales continued to be affected by the security regulations in India and by credit issues in the Middle East and Africa. Tekelec's orders in the second quarter were $72.1 million, *down 31%* from the same period in 2009. Defendants admitted that the fallout from the India security regulations would delay recognition of $10 million in projected revenues. Tekelec's shares fell another *9.37%*, to $12.48 per share, in reaction to the news.

6.     Additionally, after nearly five years at the helm of the Company, CEO Plastina unexpectedly announced his resignation from Tekelec, with his resignation effective as of January 4, 2011. Plastina's resignation came in conjunction with the Company's lowering of its annual forecast for 2010. At the same time, Tekelec lowered its revenue view to a range of $415 million to $425 million from its May 6, 2010 forecast of $465 million to $480 million, and lowered its adjusted per-share earnings estimate to a range of 62 cents to 67 cents from 85 cents to $1.00.

7.     Defendants were fully aware of the problems related to sales growth in emerging markets, and yet they breached their fiduciary duties and caused significant harm to the Company.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction pursuant to 28 U.S.C. §1332(a)(2), as plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs. This action is not a

collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

9.      This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in, and maintains operations in, this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this Court under 28 U.S.C. §1391(a) because: (1) one or more defendants either reside in, or maintain executive offices in, this District; (2) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred within this District, and (3) defendants have received substantial compensation in this District by conducting business herein and by engaging in numerous activities that have had an effect in this District.

**THE PARTIES**

11.     Plaintiff Vivian R. Dulberg ("plaintiff") is a current shareholder of Tekelec and has been a shareholder of the Company during the Relevant Period. Plaintiff resides in New York, New York.

12.     Nominal defendant Tekelec is engaged in the design, development, manufacture, marketing, sale and support of telecommunications products and services. Defendant Tekelec is a California corporation that maintains its headquarters in Morrisville, North Carolina.  Tekelec's Stock is traded under the symbol TKLC on the Nasdaq Stock Exchange.

13.     Defendant Franco Plastina ("Plastina") served as Tekelec's President, CEO and a Director of the Company during the Relevant Period.  Plastina joined

Tekelec as President and CEO and as a director in February 2006. From September 2005 until joining Tekelec, Plastina served as an Executive in Residence at Warburg Pincus LLC, a private equity firm. From May 2003 until July 2005, Plastina held various executive positions with Proxim Corporation, a provider of wireless infrastructure equipment for wireless fidelity, or Wi-Fi, and wireless broadband markets, including Executive Chairman from January 2005 until July 2005, and President and CEO and a director from May 2003 until December 2004. Plastina also serves as a director of Cree, Inc.

14.    Defendant William H. Everett ("Everett") served as Tekelec's Executive Vice President and Chief Financial Officer ("CFO") until his retirement from the Company on March 31, 2010, at which point he served as a "consultant" to the Company for the balance of the Relevant Period.

15.    Defendant Gregory S. Rush ("Rush") served as Tekelec's Chief Accounting Officer, Vice President and Corporate Controller until April 27, 2010 when the Company announced that Defendant Rush had been appointed as Tekelec's Senior Vice President and CFO, replacing Defendant Everett.

16.    Defendant Mark A. Floyd ("Floyd") served as a member of the Company's Board of Directors during the Relevant Period. Floyd has served as Chairman of Tekelec's Board of Directors and as a member of the Company's Audit and Compensation Committees. Floyd has served as a director of the Company since October 2004, was appointed as Vice Chairman of the Board in February 2006, and became Chairman of the Board in January 2007. Additionally, Floyd was named CEO of SafeNet, Inc., an information security software company, in June 2009, and has also served as CEO and President of Entrisphere, Inc., a telecommunications equipment manufacture, from August 2002 until its sale to Ericsson in February 2007. Floyd has also served as a

SHAREHOLDER DERIVATIVE COMPLAINT

director of SafeNet, Inc. and Riverbed Technology, Inc., a telecommunications equipment manufacturer, and previously served as a director of Carrier Access Corp., a telecommunications equipment manufacturer, until its February 2008 acquisition by Turin Networks, Inc.

17.     Defendant Ronald W. Buckly ("Buckly") served as a member of the Company's Board of Directors during the Relevant Period.  Buckly has served as a director since November 2007 and as a member of the Company's Corporate Development Committee.  Since April 2007, Buckly has served as Senior Vice President, Corporate Affairs and General Counsel of Ixia, a provider of IP performance test systems.  Buckly has also served as Senior Vice President, Corporate Affairs and General Counsel from January 2004 until his resignation from that office in December 2006.  Buckly also served as Tekelec's Vice President and General Counsel from April 1998 until January 2004, and as the Company's Corporate Secretary from 1987 until May 2007.  From April 1998 until November 2003, Buckly also served as counsel to Bryan Cave LLP, legal counsel to the Company.

18.     Defendant Hubert de Pesquidoux ("de Pesquidoux") served as a member of the Company's Board of Directors during the Relevant Period. Defendant de Pesquidoux has served as a director since May 2009 and has served on the Company's Audit and Corporate Development Committees.  Since November 2009, de Pesquidoux has served as CEO of HDP Consulting, a consulting company.  From 1991 until December 2009, de Pesquidoux held various positions at the telecommunications company Alcatel-Lucent SA (and its predecessor, Alcatel SA and its affiliates), where he most recently served as CFO from November 2007 until December 2009, and as President of the Enterprise business from November 2006 until December 2009.  Defendant de Pesquidoux

SHAREHOLDER DERIVATIVE COMPLAINT

- 5 -

has also served as President of Alcatel North America from June 2003 until November 2006.

19.     Defendant David R. Laube ("Laube") served as a member of the Company's Board of Directors during the Relevant Period.  Laube has served as a director since August 2008 and has served as chairperson of Tekelec's Nominating and Corporate Governance Committee and as a member of the Company's Audit Committee.   Since 2001, Laube has been Executive in Residence at the Business School at the University of Colorado, Denver.  From 1983 until 2000, Laube served in various senior financial and information technology positions at US West, Inc. (which was acquired by Qwest Communications International Inc.), where he most recently served as Vice President and Chief Information Officer from 1996 to June 2000.  Laube has also served as a director of Network Equipment Technologies, Inc., a network equipment manufacturer, which he served as chairman of the audit and nominating/corporate governance committees and a member of the compensation committee.  Laube previously served as a director of Carrier Access Corp. until its February 2008 acquisition by Turin Networks, Inc.

20.     Defendant Carol G. Mills ("Mills") served as a member of the Company's Board of Directors during the Relevant Period.  Mills has served as a director since June 2007, as chairperson of Tekelec's Compensation Committee, and as a member of the Company's Nominating and Corporate Governance Committee.   Since February 2006, Mills has been an independent consultant.  Mills has served as Executive Vice President, Router Business Unit, of Juniper Networks, Inc., a provider of networking and security solutions, from October 2004 until March 2006.  Mills has also served as a director of Adobe Systems Incorporated, a computer software company, where Mills served as the

SHAREHOLDER DERIVATIVE COMPLAINT

chairperson of the executive compensation committee and a member of the nominating and governance committee.  Mills has also served as a director of Blue Coat Systems, Inc., a network security and management company, where Mills has served as the chairperson of the compensation committee and a member of the stock option committee.

21.     Defendant Krish Prabhu ("Prabhu") served as a member of the Company's Board of Directors during the Relevant Period.  Prabhu has served as a director since May 2008 and as chairperson of Tekelec's Development Committee and as a member of the Company's Compensation Committee. Prabhu served as CEO and President of the telecommunications company Tellabs, Inc. from February 2004 until Prabhu's retirement in April 2008, and has served as an advisor to various companies in the telecommunications and semiconductor industries.  Prabhu has also served as a director of the telecommunications company ADC Telecommuncations, Inc., where Prabhu has served on the audit committee and the finance/strategic planning committee.  Additionally, Prabhu has served as a director of Altera Corporation, a semiconductor company, where he has served on the compensation committee, as vice chairman of the supervisory board of ADVA AG Optical Networking, an optical networking equipment company.

22.     Defendant Michael R. Ressner ("Ressner") served as a member of the Company's Board of Directors during the Relevant Period.  Ressner has served as a director since November 2006, as the chairperson of Tekelec's Audit Committee, and as a member of the Company's Corporate Development Committee.  From 1980 until his retirement in 2002, Ressner held a number of senior management positions in finance and operations at Nortel Networks, where Ressner most recently served as Vice President and General Manager.

Additionally, since 2002, Ressner served as an advisor in the College of Management at North Carolina State University, where, from 2002 until 2004, Ressner was also an adjunct professor of finance and accounting. Ressner has also served as a director of Exide Technologies, a battery company, where Ressner has served as chairman of the finance committee and as a member of the audit committee. Ressner has also served as chairman of the audit committee at Magellan Health Services, Inc., a health care management company, and as director for the past five years of Entrust, Inc., Arsenal Digital Solutions Worldwide, Inc., Riverstone Networks, Inc., and Proxim Corporation.

23.     Defendants Plastina, Everett, Rush, Floyd, Buckley, de Pesquidoux, Laube, Mills, Prabhu, and Pressner are collectively referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

24.     By reason of their positions as officers and directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

25.     Each director and officer of the Company owes to Tekelec and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as

1  officers and directors of a publicly held company, the Individual Defendants had a

2  duty to promptly disseminate accurate and truthful information with regard to the

3  Company's revenue, margins, operations, performance, management, projections

4  and forecasts so that the market price of the Company's stock would be based on

5  truthful and accurate information.

6      26.    The Individual Defendants, because of their positions of control and

7  authority as directors and/or officers of Tekelec, were able to and did, directly

8  and/or indirectly, exercise control over the wrongful acts complained of herein, as

9  well as the contents of the various public statements issued by the Company.

10  Because of their executive, managerial and directorial positions with Tekelec,

11  each of the Individual Defendants had access to adverse, non-public information

12  about the financial condition, operations, and misrepresentations made.

13

14      27.    At all times relevant hereto, each of the Individual Defendants was

15  the agent of the other Individual Defendants and of Tekelec, and was at all times

16  acting within the course and scope of such agency.

17      28.    To discharge their duties, the officers and directors of Tekelec were

18  required to exercise reasonable and prudent supervision over the management,

19  policies, practices and controls of the financial affairs of the Company.  By virtue

20  of such duties, the officers and directors of Tekelec were required to, among other

21  things:

22          a.    manage, conduct, supervise and direct the business affairs of

23  Tekelec in accordance with all applicable laws;

24          b.    neither violate nor knowingly permit any officer, director or

25  employee of Tekelec to violate applicable laws, rules and regulations;

26          c.    establish and maintain systematic and accurate records and

27  reports of the business and affairs of Tekelec and procedures for the reporting of

28

SHAREHOLDER DERIVATIVE COMPLAINT

- 9 -

the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

       d.    neither engage in self-dealing nor knowingly permit any officer, director or employee of Tekelec to engage in self-dealing;

       e.    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

       f.    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

       g.    properly and accurately guide investors and analysts regarding the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

       h.    remain informed regarding how Tekelec conducted its operations, and, upon receipt of notice or information of imprudent or sound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

    29.    Each Individual Defendant, by virtue of his or her position as a director and officer, owed to the Company and its shareholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the

management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants alleged herein involves a violation of their obligations as directors and officers of Tekelec, the absence of good faith on their part and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining Director Defendants who collectively comprised all of Tekelec's Board during the Relevant Period.

30.    The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to misrepresent its financial results and prospects, as detailed herein, and by failing to prevent employees and/or officers of the company from taking such illegal actions. In addition, the Company is now the subject of class action litigation alleging violation of federal securities laws, which necessitates the Company incurring excess costs arising from the Individual Defendants' wrongful course of conduct.

31.    Additionally, Tekelec has established a Code of Business Conduct ("Code") that applied to all employees of the Company. The purpose of the Code was to deter illegal or unethical acts and promote the following:

- honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;
- full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission and in other public communications made by the Company;

SHAREHOLDER DERIVATIVE COMPLAINT
- 11 -

- compliance with applicable governmental laws, rules and regulations;
- prompt internal reporting to an appropriate person or persons identified herein of violations of this Code; and
- accountability for adherence to this Code.

32.     With respect to the accuracy of record keeping and disclosures the Code provides:

a.     **Create Accurate Records**

Tekelec is committed to maintaining and providing truthful information that fully satisfies applicable legal disclosure requirements. The U.S. securities laws, including the Sarbanes-Oxley Act of 2002, protect investors and govern Tekelec's disclosure of information. These laws require us to create and maintain full, fair, timely, accurate and understandable records. All employees are responsible for Tekelec's compliance with these laws.

You must create accurate records that reflect the true nature of the transactions and activities that they record (including the reporting of time and documenting attendance and absence). You must resolve discrepancies in any records and make appropriate corrections. If you suspect or learn that records are misleading or contain errors, you must promptly report such issues. Because even a minor error can affect the truthfulness of a record, you must report all errors, regardless of their size or how long ago they may have occurred.

Tekelec does not tolerate falsification or improper alteration of records. It is never appropriate to direct someone else to prepare or approve a false or misleading record. In addition, it is not a defense to say that someone else directed you to make a record that you knew or had reason to suspect was false or misleading.

If you have concerns about a record's accuracy and you have brought them to your supervisor's attention and your supervisor has failed to address them, you must report those concerns to other Escalation Parties.

SHAREHOLDER DERIVATIVE COMPLAINT
- 12 -

b. **Promote Transparent and Complete Disclosure**

Tekelec is committed to transparency in financial reporting to enhance investors' understanding of the Company's business and to facilitate informed investment decisions. All disclosures made in financial reports and public documents filed with the Securities and Exchange Commission and other public communications must be full, fair, accurate, timely and understandable.

You must not selectively disclose (whether in one-on-one, small or other discussions or meetings) any material non-public information regarding Tekelec, its securities, business operations, plans, financial condition, results, business opportunity or any development or plan (except when expressly authorized to do so under applicable Company policies or pursuant to a nondisclosure agreement that has been reviewed and approved under such policies). You should be particularly careful not to disclose such information if you make presentations or proposals to customers, business providers, investors or any other third party.

To ensure accurate reporting, Tekelec employs both internal and outside auditors. You must cooperate with and provide any auditor or investigator accurate, timely and truthful information. You must not improperly influence, manipulate or mislead any auditor or investigator. [1]

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

33. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

---

[1]   The Code referred to is that which was submitted as an exhibit to the Company's 2009 10-K. On November 11, 2010, Tekelec amended its Code.

SHAREHOLDER DERIVATIVE COMPLAINT

34.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did:

(a)    Conceal the fact that the Company was improperly misrepresenting its financial results in order to allow defendants to artificially inflate the price of the Company's shares;

(b)    Maintain the Individual Defendants' executive and directorial positions at Tekelec and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and

(c)    Deceive the investing public, including shareholders of Tekelec, regarding the Individual Defendants' management of Tekelec's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period.

35.    In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

36.    The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least February 11, 2010, and continuing thereafter.  During this time, the Individual Defendants caused the Company to conceal the true facts that Tekelec was misrepresenting its financial results and violating applicable laws.  In addition, defendants also made other specific, false statements about Tekelec's financial performance and future business prospects, as alleged herein.

37.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things:

SHAREHOLDER DERIVATIVE COMPLAINT
- 14 -

1    (a) to disguise the Individual Defendants' breaches of fiduciary duty, abuse of

2    control, gross mismanagement, waste of corporate assets and unjust enrichment;

3    (b) to conceal adverse information concerning the Company's operations,

4    financial condition and future business prospects; and (c) to artificially inflate the

5    price of Tekelec's common stock so they could protect and enhance their

6    executive and directorial positions and the substantial compensation and prestige

7    they obtained as a result thereof.

8        38.    The Individual Defendants accomplished their conspiracy, common

9    enterprise and/or common course of conduct by causing the Company to

10   purposefully, recklessly or negligently misrepresent its financial results. Because

11   the actions described herein occurred under the authority of the Board, each of the

12   Individual Defendants was a direct, necessary and substantial participant in the

13   conspiracy, common enterprise and/or common course of conduct complained of

14   herein.

15       39.    Each of the Individual Defendants aided and abetted and rendered

16   substantial assistance in the wrongs complained of herein. In taking such actions

17   to substantially assist the commission of the wrongdoing complained of herein,

18   each Individual Defendant acted with knowledge of the primary wrongdoing,

19   substantially assisted the accomplishment of that wrongdoing, and was aware of

20   his or her overall contribution to and furtherance of the wrongdoing.

21

22                           **COMPANY BACKGROUND**

23

24       40.    Tekelec is a global provider of communication network software and

25   systems that enable users to deliver an array of communications services including

26   voice, text messaging, and mobile data services. The Company is headquartered in

27   Morrisville, North Carolina and employs approximately 1,100 people worldwide.

28

41.     Tekelec's   software   is   designed   to   enable   its   customers, predominantly mobile (or wireless) and fixed (or wireline) service providers, to optimize network efficiency and transition traditional networks to Internet Protocol ("IP") - based mobile networks. There are more than 1,800 Tekelec systems and software applications deployed in networks located in 107 countries worldwide.

42.     Tekelec's Form 10-K for the year ended December 31, 2009 (the "2009 Form 10-K") explains:

> Wireless and wireline networks make use of a signaling network that is logically and often physically separated from the media or transport network. The signaling network improves overall network performance by reducing call setup times, increasing the efficiency of the network, providing for interoperability between two independently owned networks, and providing access to enhanced services. Historically, the technology underpinning wireless and wireline networks has been the globally accepted signaling protocol known as Signaling System #7, or SS7.

> *Expanding Globally.* We sell our products internationally through our direct sales force, sales agents, partnerships, and distributor relationships. *We also sell directly from our wholly owned subsidiaries in Argentina, Australia, Belgium, Brazil, Canada, Colombia, the Czech Republic, France, Germany, India, Italy, Malaysia, Mexico, the Netherlands, Singapore, South Africa, Spain, Taiwan and the United Kingdom, and from our sales offices in China, Dubai, and the Russian Federation. Total international revenues for 2009, 2008, and 2007 were $285.8 million, $296.8 million, and $263.7 million, respectively, representing 61 016, 64016, and 61016, respectively, of our total revenues.*

> India is in the process of mandating number portability and we were successful in winning eight out of the ten service providers we were invited to bid on. The Indian government has delayed the mandatory implementation date to early to mid 2010 and, accordingly, our 2009

SHAREHOLDER DERIVATIVE COMPLAINT

- 16 -

number portability revenues do not include any significant revenues from these deals. *We currently expect that these orders will convert to revenue during 2010 and 2011. Because number portability opportunities are increasingly becoming integrated with our larger Eagle signaling opportunities, we anticipate that we will combine the reporting of our Eagle and NP product line revenues in 2010.* [Emphasis added.]

43.    The launch of Tekelec's Eagle XG platform was very important to the Company.  Tekelec designed the platform to generate growth in sales in the Company's North American and emerging markets.  In a press release announcing the launch of Eagle XG, the Company stated:

**Morrisville, NC (Thursday, February 12, 2009)** Tekelec (NASDAQ: TKLC), the network signaling, mobile messaging and performance management company, today announced the EAGLE® XG, a new signaling and session control platform that enables operators to deploy hybrid, next generation networks (NGNs) while leveraging existing technology investments. Tekelec's approach lowers capex and opex while delivering new services and improving network performance.

Subscriber growth, the increase in wireless-enabled devices, and consumer demand for third-party applications on phones is driving operators to support millions of new Internet protocol (IP)-enabled devices. This increase requires larger network databases to manage traffic and routing information. Service providers must also maintain interoperability between new session initiation protocol (SIP) and existing Signaling System 7 (SS7) protocols on their hybrid networks in order to provide uninterrupted service and maximize the value of existing network assets.

The EAGLE XG open hardware platform and applications give service providers a path forward from Tekelec's market share-leading signaling platform, the EAGLE 5, with a cost-effective, scalable migration to IP multimedia subsystem (IMS) or Long Term Evolution (LTE) networks.

SHAREHOLDER DERIVATIVE COMPLAINT
- 17 -

"Service providers must meet customers' needs for new services while watching the bottom line, especially in today's economy," said Ron de Lange, executive vice president at Tekelec. "The EAGLE XG is a natural evolution of Tekelec's signaling technology that lets operators manage hybrid networks and expand next generation networks while consolidating and simplifying network architecture."

The platform supports a converged database that enables multiple core network applications, reducing capex and opex by consolidating subscriber and network routing data and eliminating the need to manage, maintain and update databases for each application.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

44.     The Relevant Period begins on February 11, 2010, when Tekelec issued a press release announcing its earnings for the three months and year ended December 31, 2009. The press release stated:

Tekelec Announces Strong Q4 and Full Year 2009 Operating Results

**2009 Fourth Quarter Results from Continuing Operations** Revenue from continuing operations for the fourth quarter of 2009 was $123.5 million, up 3% compared to $119.9 million for the fourth quarter of 2008. *The Company had orders of $162.4 million for the quarter, up 1% from the fourth quarter of 2008, and the second consecutive quarter of year-over -year growth. As of December 31, 2009, backlog was $373.6 million compared to $336.7 million as of September 30, 2009* and $412.1 million as of December 31, 2008.

45.     CEO Plastina commented on the results, stating:

We are very pleased with our operating results, and in particular, with the strength of our orders for the fourth quarter. *Our orders for the quarter were up 1 % compared to 2008. For the last six months of the year, orders were up 4% over the same period in 2008 and we generated a book-to-bill ratio of approximately 1.10 to 1 during the second half of 2009.* Our strong financial performance during the fourth quarter and full year of 2009, including year-over-year revenue growth for the quarter and year, along with record earnings

SHAREHOLDER DERIVATIVE COMPLAINT

per share of $1.04 for the full year, reflect our disciplined approach to bringing value to our customers and shareholders despite the difficult competitive and financial climate.

**2010 Full Year Guidance**

While there remains uncertainty in current economic conditions, ***based on improved visibility compared to last year,*** we are providing full year guidance for 2010. We believe that full year revenues will range between $470 and $480 million and gross margins will be in the mid to high sixty percent range. Finally, we believe that our non-GAAP EPS range will be between $1.10 and $1.15 per diluted share and we expect the range for GAAP EPS will be between $0.90 and $0.95 cents per diluted share. In addition, we expect our book to bill ratio to be approximately one to one for the year. [Emphasis in bold and italics added.]

46.   That same day, Defendants held a conference call with securities analysts that included the following prepared remarks by the Individual Defendants:

Defendant Plastina:

We booked four new EAGLE XG orders during the fourth quarter including two expansion orders from existing EAGLE XG customers. Both expansions involved a new SIP signaling router application providing BICC to SIP interworking. BICC is one of the many protocols used by most of the world mobile service providers. In one of these wins, we simplified session management between the mobile network and the long distance network. Our application cost effectively completes the session without disrupting the billing. We won this deal against an expensive competing solution that involved the costly proposition of upgrading a mobile switching server, adding multiple media gateways and modifying the back office systems for billing. Including the four EAGLE XG wins during the fourth quarter, we have now booked a total of 13 EAGLE XG orders with 11 customers. Nine of these customers are tier one

SHAREHOLDER DERIVATIVE COMPLAINT
- 19 -

service providers. We finished the year with over $30 million of EAGLE XG orders in our backlog.

*Our continued success in the market is evidenced by our new customer wins. We added a total of five new customers during the quarter. In total, we won 19 new customers last year and have won 59 new customers over the last three years. We now have products installed in 107 countries around the world. We are especially pleased with our growth in the emerging markets such as India and Brazil and the innovative insights that we gain from emerging market service providers. In these markets, creative service providers are in many instances surpassing developed world market players in bringing innovations to market.* For example it is likely that a mobile device will facilitate a consumers first web surfing or banking experience in these markets. This scenario stresses the importance of having a global perspective and strong installed base in order to remain at the forefront of innovation. The fact that we do business with most of the world's major service providers, across 107 countries is a distinct competitive advantage for Tekelec.

Defendant Everett:

As shown on slide 17, *we had strong order entry in the fourth quarter generating $162.4 million in new orders which exceeded the high end of our previous guidance. We benefited from higher than anticipated demand,* particularly in North America. Some of these fourth quarter orders generated book shift business in the quarter which also help to succeed our revenue target and increase our quarterly gross margins. *This strong order entry generated a book to bill ratio of 1.3 for the quarter which helped increase our backlog. In the second half of 2009, we generated orders of $257.2 million, up 4% from the second half of 2008. For the full year 2009, orders were $429.8 million, down 5% compared to the full year of 2008. This performance was in an environment where year over year global telecom spending, excluding China, was down approximately 12% based on Credit Suisse's most recent industry CapEx estimates. Further, as we previously indicated, our fourth quarter orders include four EAGLE XG wins. These additional*

SHAREHOLDER DERIVATIVE COMPLAINT
- 20 -

*wins provide further market validation for the value provided by Tekelec suite of next generation signaling applications.* [Emphasis added.]

47.     During the conference call, analysts questioned Defendants Plastina and Everett about the Company's plans for international markets generally, and the Indian market in particular:

Amir Rozwadowski - Barclays Capital - Analyst:

In looking at your guidance for next year, is there a built-in expectation that you see similar patterns or increased capacity purchases or books shipped? I'm just trying to understand how you're sort of looking at it in terms of business mix coming from bookings versus books shipped in 2010.

Defendant Plastina:

The mix we've left largely the same as it was in 2009. *The 2010, 470 to 480 target reflects our current conversations and how our current customers think they're going to spend their CapEx budget. That will obviously be adjusted depending on base demand, but right now there is enough visibility for us to at least give you that annual number. Last year we didn't have that visibility. So I think that's obviously a positive sign versus last year. Right now that 470, 480 literally reflects the conversations that we've had with all our major customers.*

Defendant Everett:

Amir, if you are asking is there a fundamental change in assumption relative to that? I don't think we have a fundamentally different view. It represents a consistent component of our business. Some quarters it's higher than others, it was particularly high in Q4, but we are not assuming, for example, that we have to make some fundamental change in our books shipped business to arrive at our numbers for next year.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Amir Rozwadowski - Barclays Capital - Analyst:

Okay. That's very helpful. Lastly, if I may, Frank. You talk about improving visibility. Certainly, last quarter when we spoke, there was some concerns about particular regions not seeing any signs of recovery just yet. Europe was an area that you had mentioned. I was wondering if you could talk a bit of where we stand today. Is some of the more challenged regions, have they improved as we stand today, or how should we think about things from that perspective?

Defendant Plastina:

*I think the emerging markets remain strong. In particular our position in India and Brazil remains strong.* Western Europe remains weak. That's still an area where there is very little CapEx, anticipatory CapEx spending is probably the best way to put it. It's really day-to-day maintenance. We saw some of our book ship in 2009 to western Europe go down versus 2008. That was more than compensated by the strength in North America. I think it really comes down to not really necessarily a regional play, but where a particular service provider is in their evolution path. What is their smart phone penetration? What kind of services are they doing on their network? How much penetration do they have as they reach a saturation point? That's how we look at it as opposed to any kind of particular regional tendencies. The emerging market players are still growing because they are still adding a lot of subscribers at the very different dynamic than western Europe, for example.

George Notter - Jefferies - Analyst:

Wanted to ask about India. Obviously there's been some delay in the timing of the 3G license awards there. You mentioned all of the success you;re having in terms of LMP customer wins. I guess I'm just wondering if you are see some push outs in the timing there? I know you're involved in the signaling piece as well. What are your thoughts there? Thanks.

SHAREHOLDER DERIVATIVE COMPLAINT
- 22 -

Defendant Plastina:

*We are seeing live date push out George, but that doesn't really impact our revenue because the revenue is based on customer acceptances, which is a contractual term. So we still expect to book most of the -- vast majority of the revenues this year and next. So 12 to 24-month time frame is still what we're looking at to book all of the orders that we have in the backlog now for India number portability.*

Larry Harris - CL King - Analyst:

I want to talk more about India. I think the number portability opportunity previously been sized as around $50 million or $75 million perhaps over several years. Do you think that that opportunity, now that you've won eight out of the ten bids, has increased and also I get the sense that there's -- you're probably less concerned about margins in India than perhaps you were previously. Is that a correct assumption?

Defendant Plastina:

That's a correct assumption. I think if you look at our target for the year in 2010, we haven't moved away from historical ranges. We're comfortable with that. Obviously 2010 includes some revenue from India number portability. I think the important way to look at India number portability is it's built up a beach head for us in all of those customers. A few of those customers did not have a separate signaling layer before they had to make this number portability decision. We actually went in there and showed them the business case and having a separate layer and the savings coming from it. They decided to move to our solution for number portability, but at the same time start driving a lot of the core signaling traffic through our equipment as well. They also wanted to make sure that all of this with evolvable to 3G. They are planning ahead in the sense they don't just want to do number portability. They don't just want to handle today's signaling traffic. They wanted to make sure there was a core and a set of products that could evolve to that next generation. Certainly, our portfolio met those needs.

SHAREHOLDER DERIVATIVE COMPLAINT
- 23 -

Larry Harris - CL King - Analyst:

Do you think there are opportunities because they are going to be installing this equipment and you've won more carriers, is that larger than what you might of seen three or six months ago?

Defendant Plastina:

I think this is just going to evolve towards a sizeable signaling business much like we have in other countries where we've been there a long time and that's the way to look at it. *We think the India business, now that we've got that very solid starting point, is going to continue to morph and they're going to have extension business and all of the other things our US customers have over time. I think it's probably this year or next that India will clearly be our second largest single country market after the US.*

Defendant Everett:

Larry, without regard to even the advent of 3G, just from a subscriber basis alone, there is roughly 525 million mobile subscribers in India today. That number's projected to go up to over 800 million in the next several years. So just through subscriber growth alone there should be a significant amount of additional signaling traffic.

Defendant Plastina:

Right now, all we're doing is signaling in most of these customers. We do have a couple of customers for monitoring and our other products, but obviously we have the up sell opportunity to go deeper into each one of these accounts that we've won with the rest of our portfolio.

Larry Harris - CL King – Analyst:

Sounds positive. Thank you. [Emphasis added.]

SHAREHOLDER DERIVATIVE COMPLAINT
- 24 -

48.     Analysts' reactions to the Company's February 11 announcements were positive.  A February 12, 2010 Jeffrey's & Company, report noted the following:

> **A GREAT Q4...** Tekelec printed stronger-than-expected Q4 numbers. Revenues of $123.5 million beat our $108.2 million expectation (Street = $111.3 million). On the bottom-line, the company reported non-GAAP EPS of $0.25 versus our $0.16 expectation (our numbers include FAS 123R stock compensation expenses). The organization's profitability benefited both from top-line upside and stronger-than-expected gross margins (68.7% versus our 65.0% target). As with the prior quarter, the company experienced notably strong book-and-ship business within North America as carriers sought to keep up with growth in signaling traffic. We note that the book-and-ship signaling extensions business tends to be higher margin. ***Elsewhere, the company's emerging market business remained consistent with Q3 ($42.0 million versus $41.4 million). Emerging market bookings, however, were very strong -- $71.5 million. The mix shift continues to shift toward international markets.*** Tekelec had two 10% customers during the quarter: T-Mobile (15%) and Verizon (15%).

49.     In response to the Company's announcement and Defendants' positive statements, on February 11, 2010, the price of Tekelec stock rose $2.01 per share, or approximately 13.5%, on heavy volume to close at $16.86 per share.

50.     On February 16, 2010, Tekelec issued a press release announcing that Bharat Sanchar Nigam Ltd., the world's seventh largest telecommunications company providing a comprehensive range of telecom services in India, selected the Company to provide mobile number portability and session initiation protocol ("SIP") routing. The press release also noted that Tekelec had 97 number portability customers – including eight in India – in 33 countries at the end of 2009, and that Tekelec had won eight out of the ten number portability bids in India it had entered.

51.     On February 25, 2010, Tekelec filed its 2009 Form 10-K with the SEC, which included the following representations about the Company's disclosure and internal controls and CEO Plastina's and CFO Everett's certification thereon:

> Based on our management's evaluation (with the participation of our Chief Executive Officer and Chief Financial Officer), as of the end of the period covered by this Annual Report, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) are effective to ensure that information required to be disclosed by us in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms and is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

> Our management, including our Chief Executive Officer and our Chief Financial
> Officer, does not expect that our disclosure controls and procedures or our internal control over financial reporting are or will be capable of preventing or detecting all errors and all fraud. Any control system, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the control system's objectives will be met. The design of a control system must reflect the fact that there are resource constraints and the benefits of controls must be considered relative to their costs. Further, because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that misstatements due to error or fraud will not occur or that all control issues and instances of fraud, if any, within the company have been detected. These inherent limitations include the realities that judgments in decision-making can be faulty and that breakdowns can occur because of simple error or mistake. Controls can also be circumvented by the individual acts of some persons, by collusion of two or more people,

SHAREHOLDER DERIVATIVE COMPLAINT
- 26 -

or by management override of the controls. The design of any system of controls is based in part on certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions.

I, [Defendant Plastina and Everett], certify that:

1. I have reviewed this Annual Report on Form 10-K of Tekelec;

2. Based on my knowledge, this report does not contain any untrue statement of
a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be

designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an Annual Report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

52.   Defendants repeated these representations regarding Tekelec's disclosure controls, and Defendants' certifications thereon, in the Form 10-Q for

1  the quarter ended June 30, 2010 that Tekelec filed with the SEC during the

2  Relevant Period.

3

4  **DEFENDANTS' STATEMENTS WERE FALSE AND MISLEADING**

5
6       53.   As set forth herein, defendants' statements were materially false and

7  misleading because:

8       a)   Tekelec was experiencing known but undisclosed difficulties in

9    fulfilling orders in its emerging markets in general, and India in particular,

10
11   because of security and regulatory issues;

12       b)   Tekelec's customers in the Company's emerging markets were

13
14   experiencing credit issues that caused them to delay purchases of the

15   Company's products and services; and

16       c)   Tekelec was experiencing a sharp decline in new orders that were

17
18   reasonably likely to have a material adverse effect on the Company's

19   backlog and operating results.

20
21       54.   As a result,, Defendants' representations concerning their "visibility"

22  into the Company's earnings, that the Company's emerging markets "remain

23  strong," that Tekelec's "position in India and Brazil remains strong" and that

24  delays in Indian license awards "doesn't really impact our revenue because the

25  revenue is based on customer acceptances, which is contractual," were materially

26  false and misleading.  Similarly, for the same reasons, Defendants' statements

27

28

1   about the Company's prospects and growth and representations concerning the

2   Company's disclosure controls were also materially false and misleading.

### THE TRUTH BEGINS TO EMERGE

5   55.   On May 6, 2010, Tekelec issued two press releases: (1) an

6   announcement of the Company's agreements to acquire two networking

7   companies, Camiant and Blueslice Networks; and (2) an announcement of the

8   Company's earnings for the first quarter ended March 31, 2010:

> Revenue for the first quarter of 2010 was $116.0 million, down 1%
> compared to $116.7 million for the first quarter of 2009. The
> Company had orders of $56.7 million for the quarter, down 17%
> from the first quarter of 2009. *Orders in the first quarter of 2010*
> *were adversely impacted in part by new regulations in India,*
> *which require equipment suppliers receive a security clearance*
> *from the Indian government prior to receiving purchase orders*
> *from telecommunications carriers. These new regulations resulted*
> *in the delay of approximately $10 million of orders. We expect to*
> *receive these orders during the second quarter of 2010.* As of
> March 31, 2010, backlog was $308.4 million compared to $373.6
> million as of December 31, 2009 and $359.3 million as of March
> 31, 2009.

> Full Year 2010 Guidance

> For the full year, we expect combined revenues will range between
> $465 million and $480 million. This estimate reflects the
> elimination of up to an estimated $10 million of deferred revenues
> from the acquired companies as a result of purchase accounting.
> Gross margins are estimated to be in the mid to high sixty percent
> range. We expect non-GAAP EPS, excluding the impact of the
> above mentioned purchase accounting adjustments and certain one-
> time acquisition related items, to range between $0.95 and $1.10 per

share. Including the estimated $0.08 to $0.12 cents per share impact of these items, we expect our non-GAAP range to be between $0.85 and $1.00 per share. Finally, we expect our book to bill ratio to be approximately 1 to 1.

56.     That same day, Defendants held a conference call with analysts that included the following statements by Defendants Plastina and Rush:

Defendant Plastina:

Turning to the results for the first quarter, we generated orders of $56.7 million, revenue of $116 million, gross margins of 67%, operating margins of 24%, and diluted EPS of $0.26 per share. *In addition to typical first quarter seasonality, orders in the first quarter were adversely impacted in part by new regulations in India. These new rules require equipment suppliers to receive a security clearance from the Indian government prior to receiving purchase orders from telecommunications carriers. These new regulations resulted in the delay of approximately $10 million of orders. We expect to receive these orders during the current quarter.* Greg will provide more detail of our results later in the call.

Defendant Rush:

I would like to point out that there are an unusually large number of acceptances, particularly those associated with number portability in India, which could result in significant variability in our revenues between the second and third quarter. Based on our current expectations, we believe our second quarter revenues will be our lowest of the year and lower than Q2 2009. We expect our combined book to bill ratio will be approximately one to one for the year. [Emphasis added.]

57.     In response to questions by analysts, Defendant Plastina stated:

Brian Modoff - Deutsche Bank - Analyst:

SHAREHOLDER DERIVATIVE COMPLAINT
- 31 -

Okay and then turning to your business, the $6 million in orders, even if you add the $10 million in, was still weak. Is this really more of a softening demand transfer to EAGLE 5? In other words, are we starting to see that product line starting to show it's age a little bit before the EAGLE XG pops up or what is your view on that?

<u>Defendant Plastina:</u>

It is a combination of things. ***It is really a slow [down] in the emerging markets is what we have seen.*** The aggressive build up and extension and expansion plans have just been slowed down. We saw a pretty solid US business, including EAGLE 5. Year over year our booked ship business was up in the quarter. So it seems to be a bit of a regional thing in terms of the EAGLE 5 business. Going forward, the plan is always to start moving all of the expansion capabilities, including SIGTRAN and all the other core processing functionality onto EAGLE XG.

<u>Amir Rozwadowski - Barclays Capital - Analyst:</u>

Thank you very much and good morning, Frank, Greg and Mike. Frank, I just wanted to turn to your guidance a bit here. If we take a look at sort of the organic guidance for the business it seems to have come down a little bit from your prior expectations. I was wondering what the major puts and takes were there? Is it sort of the timing around some of the India related issues you had mentioned or how we should think about that?

<u>Defendant Plastina:</u>

A couple of things. Really the cautiousness in the emerging markets, as I mentioned in the earlier question. ***What we are seeing is, is a more cautious spending tone in terms of the expansion business in some of the bigger emerging markets and that includes India. India, then has the security issues that really delayed things by about 90 days in the first quarter. There is a double whammy in India.*** Overall, we are still seeing some pretty good traction and expect growth in our non - EAGLE 5 business. So this is really an

SHAREHOLDER DERIVATIVE COMPLAINT
- 32 -

emerging markets EAGLE 5 related flatness.  Is the way I would categorize it. The order outlook has come down. The revenue has come down a bit. Obviously, now we've got the opportunity to up sell the new products and we expect some contribution from the new products this year.

Michael Genovese - Soleil Securities - Analyst:

Okay. And then, last quarter, you had a lot of wins that you talked about in mobile number portability deals in India. What is the outlook now for that? For actually M&P to actually be implemented and for some -- for orders in that area to come back? What is your current thinking?

Defendant Plastina:

The implementation is going on as we speak. We are ready to actually turn on several of the networks. And as you heard, in Greg's prepared remarks, we have some acceptance based deals specifically related to the number portability work in India that we are not quite sure if it is going to be June or July. That is why we are going to have variability between Q2 and Q3. But we are pretty confident they are going to happen this year. [Emphasis added.]

58.    On May 6, 2010, in response to the Company's adverse statements regarding the effects of emerging markets in general, and India in particular, on the Company's operating performance, Tekelec's stock price dropped approximately 20% on very heavy volume to close at $14.10 per share, as a portion of the artificial inflation came out of the stock price. However, the May 6, 2010 disclosures did not reveal the true scope of the problems that the Company was facing.  It was not until August 5, 2010, that Defendants fully disclosed the falsity of their prior misrepresentations.

59.     On August 5, 2010, Tekelec issued a press release announcing its operating results for the quarter ended June 30, 2010:

> Revenue for the second quarter of 2010 was $109.5 million, down 4% compared to $114.2 million for the second quarter of 2009. *The Company's orders were $72.1 million for the quarter, down 31 % from the second quarter of 2009. Order input was down primarily due to a reduction in SS7 and SIGTRAN orders in emerging markets, including ongoing delays caused by security- related regulations imposed by the Indian government. As of June 30, 2010, backlog was $271.6 million compared to $308.4 million as of March 31, 2010 and $353.3 million as of June 30, 2009.* Gross margins for the second quarter of 2010 were 63%, compared to 67% in the second quarter of 2009. Non-GAAP gross margins for the second quarter of 2010 were 67%, compared to 68% for the second quarter of 2009. [Emphasis added.]

60.     That same day, Defendants held a conference call with securities analysts for investors, which included the following statements by Defendant Plastina:

> However, order input fell short of expectations. We generated $72 million in orders for the second quarter. *Our year-to-date orders of $129 million are down 25% compared to the same period last year.* As discussed on the previous call, we continue to see lower SIGTRAN SS7 solution orders primarily from emerging markets.

> In addition, *order input in India continues to be impacted by the new security regulations imposed by the Indian government, as well as delays in the expected deployment of 3G networks. These delays impacted the order input that we had expected from our base of customers in India during the first half.* We are reviewing the most recent security-related regulations imposed by the Indian government, and although the impact of such regulations on our operations and order flows is uncertain, we expect improved order flow in the second half of 2010. Also the pipeline and quote activity for business in India is very healthy across many parts of our

SHAREHOLDER DERIVATIVE COMPLAINT
- 34 -

portfolio. Several of our customers in India have already consumed a signaling capacity purchased last year as part of their planned growth, including number portability.

Despite the ongoing delays in order input, our work on the ground in India has continued. We recognized approximately $15 million of EAGLE and number portability-related revenue in India during the quarter. These revenues are reflected in our Q2 gross margin performance of 67%.

***Looking to other emerging market regions, the Middle East and Africa continue to be challenged with credit issues,*** forcing many service providers to delay purchases and run their networks at near capacity. As an example, we received approximately $4 million in orders from customers in this region during the quarter that we will not book until we have a clear view that payment will be secured. [Emphasis added.]

61.   On the same conference call with analysts, Defendant Plastina also represented the following:

<u>Larry Harris - CL King & Associates - Analyst:</u>

Yes, thank you. A couple of questions. One with respect to India. I know the security situation there is still evolving but how long under your current accounting rules, say before we might see a rebound in revenues? In other words, if this were to be resolved in the next month or two, how long before we might see orders, then shipments, and could the revenues from the resolution of these issues occur in the fourth quarter, or might we be looking at the early next year?

<u>Defendant Plastina:</u>

Larry, this is really something that gets pushed out to 2011. Because right now if we get – ***we're already in August, if we get orders from India, it's very difficult for us to turn those into revenue before the end of this year depending on the size of the orders. Obviously some smaller orders would be easier than others. So if it's going to take us another month or so to sort this out with the Indian -- with the***

SHAREHOLDER DERIVATIVE COMPLAINT
- 35 -

*customers and the Indian government or perhaps even longer, we're looking at revenues being pushed out to 2011 for any orders that come from India this year. That's reflected in our guidance today. So that 7% adjustment that we've made bringing the range down reflects the fact that we're not going to get those revenues in this year.* [Emphasis added.]

62.     In response to these statements, the price of Tekelec common stock fell *more than 9%* on heavy trading volume, as the remaining artificial inflation came out of the Company's stock price.

63.     Analysts reacting to Tekelec's August 5, 2010 revelations expressed their dissatisfaction:

**UGGHHH! SOFT BOOKINGS... AGAIN.** Forward-looking metrics were disappointing for the second straight quarter. Aggregate orders totaled $72.1 million, up 27% Q/Q from $56.7 million but down 31% from $104.7 million in the year-ago quarter. Compared with Q1, backlog fell to $271.6 million (down 12% Q/Q) and book-to-bill improved to 0.66x (vs. 0.49x in Q1). The bookings softness comes from: 1) the new security regulations in India associated with network equipment; and 2) credit issues among Tekelec's customers in the Middle East and Africa. - August, 6 2010 Jeffries & Company Analyst Report

and

*For the present, we remain on the sidelines with our Hold rating on the name* **[Tekelec].** - August 5, 2010 Deutsche Bank Analyst Report.

64.     Additionally, at the same time Defendants were concealing the true scope of Tekelec's financial health, they engaged in insider trading. Defendants' false statements about the Company enabled Defendants Buckly, Everett, Floyd, Plastina, Rush and Mills to sell approximately $8.125 million in Tekelec stock during the Relevant Period, as illustrated by the following chart:

SHAREHOLDER DERIVATIVE COMPLAINT
- 36 -

**DEFENDANTS'STOCK TRANSACTIONS DURING THE RELEVANT PERIOD**

| Name | Tran. Date | Action | Price From | Price To | Mkt Value | Shares |
|---|---|---|---|---|---|---|
| Ronald W. Buckly | 2/16/2010 | S | $16.73 | $16.89 | $67,240 | -4,000 |
| Ronald W. Buckly | 3/5/2010 | OE | $11.98 | $11.98 | $71,880 | 6,000 |
| Ronald W. Buckly | 3/5/2010 | S | $18.25 | $18.25 | $109,500 | -6,000 |
| | | | | | | |
| Hubert de Pesquidoux | 5/14/2010 | OE | $0.00 | $0.00 | $0 | 8,000 |
| Hubert de Pesquidoux | 5/15/2010 | OE | $0.00 | $0.00 | $0 | 3,333 |
| | | | | | | |
| William H. Everett | 2/15/2010 | OE | $0.00 | $0.00 | $0 | 1,250 |
| William H. Everett | 2/16/2010 | OE | $16.42 | $16.42 | $410,500 | 25,000 |
| William H. Everett | 2/16/2010 | D | $16.88 | $16.88 | $12,609 | -747 |
| William H. Everett | 2/16/2010 | D | $16.88 | $16.88 | $410,505 | -24,319 |
| William H. Everett | 2/18/2010 | AS | $16.62 | $16.62 | $398,808 | -24,000 |
| William H. Everett | 2/25/2010 | OE | $0.00 | $0.00 | $0 | 9,779 |
| William H. Everett | 2/25/2010 | D | $16.60 | $16.60 | $53,850 | -3,244 |
| William H. Everett | 2/26/2010 | D | $16.52 | $16.52 | $40,210 | -2,434 |
| William H. Everett | 2/26/2010 | OE | $0.00 | $0.00 | $0 | 7,500 |
| William H. Everett | 2/27/2010 | OE | $0.00 | $0.00 | $0 | 4,250 |

| Name | Tran. Date | Action | Price From | Price To | Mkt Value | Shares |
|---|---|---|---|---|---|---|
| William H. Everett | 3/1/2010 | D | $17.26 | $17.26 | $37,610 | -2,179 |
| William H. Everett | 3/1/2010 | D | $17.26 | $17.26 | $104,216 | -6,038 |
| William H. Everett | 3/1/2010 | OE | $12.26 | $12.26 | $104,210 | 8,500 |
| | | | | | | |
| Mark A. Floyd | 2/26/2010 | OE | $12.25 | $12.25 | $30,625 | 2,500 |
| | | | | | | |
| Franco Plastina | 2/15/2010 | OE | $0.00 | $0.00 | $0 | 15,625 |
| Franco Plastina | 2/16/2010 | D | $16.88 | $16.88 | $88,181 | -5,224 |
| Franco Plastina | 2/17/2010 | AS | $16.65 | $16.76 | $125,412 | -7,500 |
| Franco Plastina | 2/17/2010 | OE | $11.96 | $11.96 | $1,196,000 | 100,000 |
| Franco Plastina | 2/17/2010 | D | $16.82 | $16.82 | $1,196,003 | -71,106 |
| Franco Plastina | 2/17/2010 | D | $16.82 | $16.82 | $157,704 | -9,376 |
| Franco Plastina | 2/22/2010 | AS | $16.79 | $16.79 | $327,688 | -19,518 |
| Fracno Plastina | 2/25/2010 | D | $16.60 | $16.60 | $89,839 | -5,412 |
| Franco Plastina | 2/25/2010 | OE | $0.00 | $0.00 | $0 | 16,299 |
| Franco Plastina | 2/27/2010 | OE | $0.00 | $0.00 | $0 | 7,500 |
| Franco Plastina | 3/1/2010 | D | $17.26 | $17.26 | $54,956 | -3,184 |
| Franco Plastina | 5/7/2010 | D | $14.59 | $14.59 | $139,364 | -9,552 |
| Franco | 5/7/2010 | OE | $0.00 | $0.00 | $0 | 22,500 |

| Name | Tran. Date | Action | Price From | Price To | Mkt Value | Shares |
|---|---|---|---|---|---|---|
| Plastina | | | | | | |
| Franco Plastina | 5/11/2010 | AS | $14.90 | $14.92 | $111,756 | -7,500 |
| Franco Plastina | 5/11/2010 | OE | $11.96 | $11.96 | $1,196,000 | 100,000 |
| Franco Plastina | 5/11/2010 | D | $15.11 | $15.11 | $1,196,002 | -79,153 |
| Franco Plastina | 5/11/2010 | D | $15.11 | $15.11 | $133,708 | -8,849 |
| | | | | | | |
| Gregory S. Rush | 2/26/2010 | OE | $0.00 | $0.00 | $0 | 2,500 |
| Gregory S. Rush | 2/26/2010 | D | $16.52 | $16.52 | $15,975 | -967 |
| Gregory S. Rush | 2/27/2010 | OE | $0.00 | $0.00 | $0 | 1,875 |
| Gregory S. Rush | 3/1/2010 | OE | $0.00 | $0.00 | $0 | 7,500 |
| Gregory S. Rush | 3/1/2010 | D | $17.26 | $17.26 | $53,696 | -3,111 |
| Gregory S. Rush | 3/8/2010 | AS | $18.20 | $18.20 | $141,905 | -7,797 |
| Gregory S. Rush | 5/19/2010 | AS | $14.81 | $14.81 | $50,008 | -3,377 |
| | | | | | | |
| Carol G. Mills | 5/16/2009 | OE | $0.00 | $0.00 | $0 | 8,000 |
| **Total** | | | | | **$8,125,960** | |

**Transaction Code Key**

| | |
|---|---|
| S | Sell |
| OE | Option Exercised |
| AS | Automatic |

SHAREHOLDER DERIVATIVE COMPLAINT

| Name | Tran. Date | Action | Price From | Price To | Mkt Value | Shares |
|------|-----------|--------|-----------|----------|-----------|--------|
| D | Sell Disposed | | | | | |

Note: D – Sale (or disposition) back to the issuer of the securities.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

65.   Plaintiff brings this action derivatively in the right and for the benefit of Tekelec to redress injuries suffered, and to be suffered, by Tekelec as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Tekelec is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction in this Court that it would not otherwise have.

66.   Plaintiff will adequately and fairly represent the interests of Tekelec and its shareholders in enforcing and prosecuting its rights.

67.   Plaintiff is the owner of Tekelec common stock and was the owner of Tekelec common stock at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

68.   At the time that this action was commenced, the Tekelec Board consisted of the following directors: defendants Plastina, Floyd, Buckly, de Pesquidoux, Laube, Mills, Prabhu and Ressner.

69.    As a result of the facts set forth herein, plaintiff has not made any demand on the Tekelec Board to institute this action against the Individual Defendants.  Such demand would be a futile and useless act with respect to each and every one of the Individual Defendants because they are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the following reasons:

(a)    The Company has admitted in its 2009 14A Proxy Statement that Defendants Buckly and Plastina were not independent directors pursuant to the requirements of the NASDAQ Capital Markets, including NASDAQ Marketplace Rule 4200(a)(15), and applicable SEC regulations.  Additionally, defendant Buckly lacks independence from defendants Floyd and Mills as they are defendants who are not disinterested and/or independent and who exert influence over the compensation for defendant Buckly by virtue of their positions as members of the Compensation Committee.   The Compensation Committee annually reviews and approves corporate goals and objectives relevant to the compensation for defendant Buckly evaluates his performance in light of those goals and objectives, and approves his compensation level based upon these evaluations.  This lack of independence renders defendants Buckly and Plastina incapable of impartially considering a demand to commence and vigorously prosecute this action;

(b)    Defendants face a substantial likelihood of being held liable for breaching their fiduciary duties of loyalty and good faith as alleged herein, and are therefore incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action.

1      (c)    The principal professional occupation of Defendant Plastina

2  was his employment with the Company, pursuant to which he received significant

3  compensation from the Company as illustrated more fully below:

4

| 2009 EXECUTIVE COMPENSATION | | | | | | |
|---|---|---|---|---|---|---|
| Executive | SALARY | Other Compensation | STOCK AWARDS | OPTION AWARDS | Non-Equity Incentive Plan Compensation | TOTAL |
| Franco Plastina | $570,000 | $9,114 | $1,103,400 | $223,440 | $766,080 | $2,672,034 |

| 2008 EXECUTIVE COMPENSATION | | | | | | |
|---|---|---|---|---|---|---|
| Executive | SALARY | Other Compensation | STOCK AWARDS | OPTION AWARDS | Non-Equity Incentive Plan Compensation | TOTAL |
| Franco Plastina | $570,000 | $8,614 | $821,000 | $979,880 | $940,801 | $3,320,295 |

    (d)    Tekelec's non-employee directors have received, and continue to receive, substantial compensation in the form of cash and stock option awards. These defendants are also interested in maintaining their positions on the Board so as to safeguard their substantial compensation and stock options. The following charts illustrate the substantial compensation that these directors have received, which demonstrates that demand upon such individuals would be futile:

SHAREHOLDER DERIVATIVE COMPLAINT
- 42 -

| 2009 DIRECTOR COMPENSATION | | | | |
|---|---|---|---|---|
| DIRECTOR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | OPTION AWARDS | TOTAL |
| Ronald W. Buckly | $54,000 | $127,840 | - | $181,840 |
| David R. Laube | $62,000 | $127,840 | - | $189,840 |
| Carol G. Mills | $70,000 | $127,840 | - | $197,840 |
| Krish A. Prabhu | $62,775 | $127,840 | - | $190,615 |
| Michael P. Ressner | $74,000 | $127,840 | - | $201,840 |
| Hubert de Pesquidoux | $38,489 | $287,640 | - | $326,129 |

| 2008 DIRECTOR COMPENSATION | | | | |
|---|---|---|---|---|
| DIRECTOR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | OPTION AWARDS | TOTAL |
| Ronald W. Buckly | $61,505 | $82,415 | $67,826 | $211,746 |
| David R. Laube | $23,250 | $77,117 | - | $100,367 |
| Carol G. Mills | $84,640 | $82,415 | $94,588 | $261,643 |
| Krish A. Prabhu | $39,706 | $116,751 | - | 156,457 |
| Michael P. Ressner | $86,600 | $82,415 | $85,051 | $254,066 |

(e)    The entire Tekelec Board and senior management participated in the wrongs complained of herein. For the reasons described herein, Tekelec's directors are not disinterested or independent. Pursuant to their specific duties as Board members, each was charged with the management of the Company and the

SHAREHOLDER DERIVATIVE COMPLAINT

- 43 -

conduct of its business affairs. Each of the above referenced defendants breached the fiduciary duties they owed to Tekelec and its shareholders in that they failed to prevent and correct the dissemination of the Company's false and misleading statements. Thus, the Tekelec Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome because their actions have subjected Tekelec to millions of dollars in potential liability for violations of applicable securities laws;

(f) Defendant Plastina certified certain of Tekelec's SEC filings. Accordingly, demand is futile as he faces a substantial likelihood of liability for breach of fiduciary duties owed to Tekelec;

(g) Defendants concealed the true scope of Tekelec's financial health and enabled Defendants Buckly, Everett, Floyd, Plastina, Rush, and Mills to sell approximately $8.125 million in Tekelec stock during the Relevant Period;

(h) Defendants Ressner, de Pesquidoux, Laube, and Floyd were aware of the Company's ongoing unlawful and improper business practices and the dissemination of materially false and misleading statements and, yet, still permitted the Company to portray to the public the Company's false and misleading information despite their heightened fiduciary obligations as members of the Company's Audit Committee. Defendant Ressner served as Chair of Tekelec's Audit Committee during the Relevant Period and defendants de Pesquidoux, Floyd, and Laube served as members of Tekelec's Audit Committee during the Relevant Period. The purpose of Tekelec's Audit Committee was to assist the Board in fulfilling its oversight responsibilities for financial matters. Specifically, the Audit Committee was to assist the Board in overseeing: (1) the integrity of the Company's financial statements; (2) the qualifications,

independence, and performance of the Company's independent registered public accounting firm; (3) the performance of the Company's internal audit function; (4) the integrity of the Company's systems of internal accounting and financial controls; and (5) the Company's compliance with legal and regulatory requirements. The Audit Committee, moreover, is responsible for monitoring the operation of Tekelec's disclosure committee, reviewing the Company's disclosure controls and procedures with the Company's CEO and CFO, reviewing Tekelec's risk management and risk assessment policies, and discussing, at least annually, with the Company's General Counsel or outside legal counsel, the effectiveness of the Company's legal compliance programs and other legal matters. Additionally, the Audit Committee met privately, outside the presence of Tekelec's management, with the Company's independent registered public accounting firm to discuss, among other matters, Tekelec's internal accounting control policies and procedures and the financial statements included in the Company's annual reports on Form 10-K and quarterly reports on Form 10-Q. As part of its oversight role with respect to the Company's financial statements and the public disclosure of the Company's financial results, moreover, the Company's Audit Committee regularly reviewed and discussed with Tekelec's management the financial statements included in the Company's annual reports on Form 10-K and quarterly reports on Form 10-Q, its quarterly earnings releases, and the financial guidance that the Company provided to analysts, ratings agencies, and the public. The Audit Committee also met regularly in separate executive sessions with Tekelec's CFO, Chief Accounting Officer, and other members of the Company's executive management team. The Company's Audit Committee also operates pursuant to a written charter approved by the Company's Board, which provides, among other things, that Audit Committee members must: "[r]eview and discuss with

SHAREHOLDER DERIVATIVE COMPLAINT

- 45 -

management, at least quarterly, significant issues, estimates, and judgments that may have a material impact on the Company's financial statements or, internal controls, or may be a matter of public interest or exposure" and "[r]eview and discuss with management, prior to release, the Company's earnings press releases (including the use of non GAAP financial measures therein) as well as financial information and earnings guidance provided to analysts and rating agencies . . . ." As a result, Defendants Ressner, de Pesquidoux, Floyd, and Laube knew, or should have known, of the Company's wrongdoing alleged herein, but intentionally or recklessly violated their duties as members of the Audit Committee.   Specifically, because of these duties and responsibilities – particularly the Audit Committee's responsibility to discuss the Company's financial information and earnings guidance with Tekelec's management prior to release – members of the Audit Committee were aware that Tekelec's positive statements about the Company's prospects and growth were made without a reasonable basis.  Indeed, through such discussions with Tekelec's management, the Audit Committee was aware that the Company was experiencing a significant decline in new orders from India because of security and regulatory issues and that the Company's customers in emerging markets were facing credit issues that delayed purchases.   As such, Defendants Ressner, de Pesquidoux, Floyd, and Laube breached their fiduciary duties of loyalty and good faith to the Company. Additionally, the failure of Defendants Ressner, de Pesquidoux, Floyd, and Laube to perform their duties as members of the Audit Committee with loyalty and in good faith raises a substantial likelihood of non-exculpated personal liability on their part.  As a result, Defendants Ressner, de Pesquidoux, Floyd, and Laube cannot impartially consider a demand on the Board to commence litigation against themselves;

1    (i)    Each of the key officers and directors knew of and/or directly

2    benefited from the wrongdoing complained of herein thereby rendering demand

3    futile;

4    (j)    The Individual Defendants approved and/or permitted the

5    wrongs alleged herein to have occurred and participated in efforts to conceal or

6    disguise those wrongs from Tekelec's stockholders or recklessly and/or

7    negligently disregarded the wrongs complained of herein, and are therefore not

8    disinterested parties;

9    (k)    In order to bring this suit, all of Tekelec's directors would be

10   forced to sue themselves and persons with whom they have extensive business and

11   personal entanglements, which they will not do, thereby excusing demand;

12   

13   (l)    The acts complained of constitute violations of the fiduciary

14   duties owed by Tekelec's officers and directors and these acts are incapable of

15   ratification;

16   (m)    Each of the Individual Defendants authorized and/or permitted

17   the false statements disseminated directly to the public and which were made

18   available and distributed to shareholders, authorized and/or permitted the issuance

19   of various of the false and misleading statements and are principal beneficiaries of

20   the wrongdoing alleged herein, and thus could not fairly and fully prosecute such

21   a suit even if they instituted it;

22   (n)    Any suit by the Company's current directors to remedy these

23   wrongs would likely expose the Individual Defendants and Tekelec to further

24   violations of the securities laws that would result in civil actions being filed

25   against one or more of the Individual Defendants, thus, they are hopelessly

26   conflicted in making any supposedly independent determination whether to sue

27   themselves;

28

(o)    Tekelec has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Tekelec any part of the damages Tekelec suffered and will suffer thereby; and

p.    If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in a class action complaint for violations of securities law, which admissions would impair their defense of the class action and greatly increase the probability of their personal liability in the class action, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants. Thus, the Individual Defendants would be forced to take positions contrary to the defenses they will likely assert in the securities class action.

70.    Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for Tekelec for any of the wrongdoing alleged by plaintiff herein.

71.    Plaintiff, moreover, has not made any demand on shareholders of Tekelec to institute this action since demand would be a futile and useless act for the following reasons:

(a)    Tekelec is a publicly held company with over 68.5 million shares outstanding, and thousands of shareholders;

(b)    Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses of phone numbers of shareholders; and

SHAREHOLDER DERIVATIVE COMPLAINT
- 48 -

(c)   Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

72.   Furthermore, the conduct complained of herein could not have been the product of good faith business judgment, and each of these directors faces a substantial likelihood of liability for breaching their fiduciary duties because, through their intentional misconduct, they have subjected Tekelec to substantial damages.  Furthermore, the conduct of the Individual Defendants has subjected the Company to potential liability in connection with a securities fraud class action entitled, *Pipefitters Local No. 636 v. Tekelec, et al.,* Case No. 5:11-cv-00004-D, currently pending in the United States District Court for the Eastern District of North Carolina.   Through their intentional misconduct, Individual Defendants have subjected the Company to potential costs, fines, and judgments associated with the securities class action.   Such actions by the Individual Defendants cannot be protected by the business judgment rule.   Accordingly, making a pre-suit demand on the Individual Defendants would be futile.

## COUNT I
## (AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY)

73.   Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

74.   Defendants owed a fiduciary duty to Tekelec to supervise the issuance of the Company's press releases and public filings to ensure that they were truthful and accurate and that such filings conformed to applicable securities laws.  Defendants, however, breached their fiduciary duties by failing to properly supervise and monitor the adequacy of Tekelec's internal controls and by allowing the Company to issue and disseminate misleading statements and filings.

75.   Defendants have engaged in a sustained and systematic failure to exercise their oversight responsibilities and to ensure that Tekelec complied with applicable laws, rules and regulations.

76.   As members of the Tekelec Board, the Individual Defendants were directly responsible for authorizing, permitting the authorization of, or failing to monitor the practices that resulted in violations of applicable laws as alleged herein. Each of them had knowledge of and actively participated in, approved, and/or acquiesced in the wrongdoing alleged herein or abdicated his or her responsibilities with respect to this wrongdoing. The alleged acts of wrongdoing have subjected the Company to unreasonable risks of loss and expenses.

77.   Each of defendants' acts in causing or permitting the Company to disseminate material misrepresentations and omissions to the investing public and abdicating his or her oversight responsibilities to the Company have subjected the Company to liability for violations of applicable laws, and therefore were not the product of a valid exercise of business judgment, constituting a complete abdication of their duties as officers and/or directors of the Company. As a result of defendants' breaches, Tekelec is the subject of a major securities fraud class action lawsuit by defrauded investors, and the Company's reputation in the business community and financial markets has been irreparably tarnished.

## COUNT II
## (AGAINST THE INDIVIDUAL DEFENDANTS FOR GROSS MISMANGEMENT)

78.   Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

79.   Defendants had a duty to Tekelec and its shareholders to prudently supervise, manage, and control the operations, business, and internal financial accounting and disclosures of the Company. Defendants, however, by their

actions and by engaging in the wrongdoing alleged herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of Tekelec in a manner consistent with the duties imposed upon them by law.   By committing the misconduct alleged herein, defendants breached their duties of due care, diligence, and candor in the management and administration of Tekelec's affairs and in the use and preservation of the Company's assets.

80.   During the course of the discharge of their duties, defendants were aware of the unreasonable risks and losses associated with their misconduct. Nevertheless, defendants caused Tekelec to engage in the scheme described herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties to the Company.   As a result, defendants grossly mismanaged Tekelec, thereby causing damage to the Company.

## COUNT III
## (AGAINST THE INDIVIDUAL DEFENDANTS FOR CONTRIBUTION AND INDEMIFICATION)

81.   Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

82.   Tekelec is alleged to be liable to various persons, entities and/or classes by virtue of the facts alleged herein that give rise to defendants' liability to the Company.

83.   Tekelec's alleged liability on account of the wrongful acts, practices, and related misconduct alleged arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of defendants, and the Company is entitled to contribution and indemnification from each defendant in connection with all such claims that have been, are, or may in the future be asserted against Tekelec, by virtue of the Individual Defendants' misconduct.

**COUNT IV**
**(AGAINST THE INDIVIDUAL DEFENDANTS FOR ABUSE OF CONTROL)**

84.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

85.     The Individual Defendants' conduct, as alleged herein, constituted an abuse of their control over Tekelec.

86.     As a direct and proximate result of the Individual Defendants' abuse of control, the Company has suffered, and will continue to suffer, damages for which the Individual Defendants are liable.  Plaintiff, moreover, has no adequate remedy at law.

**COUNT V**
**(AGAINST THE INDIVIDUAL DEFENDANTS FOR WASTE OF CORPORATE ASSETS)**

87.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

88.     The Individual Defendants' conduct, as alleged herein, constituted a waste of the corporate assets of Tekelec.

89.     As a direct and proximate result of the Individual Defendants' abuse of control, the Company has suffered, and will continue to suffer, damages for which the Individual Defendants are liable.  Plaintiff, moreover, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

SHAREHOLDER DERIVATIVE COMPLAINT
- 52 -

1    B.    Awarding to plaintiff the costs and disbursements of the action,

2  including reasonable attorneys' fees, accountants' and experts' fees, costs, and

3  expenses; and

4    C.    Granting such other and further relief as the Court deems just and

5  proper.

6                              **JURY DEMAND**

7        Plaintiff demands a trial by jury.

8

9  DATED:  March 3, 2011              GLANCY BINKOW & GOLDBERG

10                                    LLP

11                                    By: _____
                                       LIONEL Z. GLANCY
12                                     EX KANO S. SAMS II
                                       LOUIS BOYARSKY
13                                     1801 Avenue of the Stars, Suite 311
                                       Los Angeles, California 90067
14                                     Telephone: (310) 201-9150
                                       Facsimile: (310) 201-9160
15

16                                    THE BRISCOE LAW FIRM, PLLC
                                       WILLIE C. BRISCOE
17                                     The Preston Commons
                                       8117 Preston Road, Suite 300
18                                     Dallas, Texas 75225
                                       Telephone: (214) 706-9314
19                                     Facsimile: (214) 706-9315

20                                    *Counsel for Plaintiff Vivian R. Dulberg*

21

22

23

24

25

26

27

28

              SHAREHOLDER DERIVATIVE COMPLAINT
                            - 53 -

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge James V. Selna and the assigned discovery Magistrate Judge is Robert N. Block.

The case number on all documents filed with the Court should read as follows:

## SACV11- 351 JVS (RNBx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

==================================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [X] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |
|---|---|---|

Failure to file at the proper location will result in your documents being returned to you.

Name & Address:
Lionel Z. Glancy (#134180)
GLANCY BINKOW & GOLDBERG LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
Telephone: (310) 201-9150

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIVIAN R. DULBERG, Derivatively on Behalf of Herself and All Others Similarly Situated,<br><br>PLAINTIFF(S)<br>v.<br><br>FRANCO PLASTINA<br>[See Attachment for Additional Defendants]<br><br>DEFENDANT(S). | CASE NUMBER<br><br>**SACV11-00351 JVS (RNBx)**<br><br>**SUMMONS** |

TO:      DEFENDANT(S): <u>THE ABOVE-NAMED DEFENDANTS</u>

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, _Lionel Z. Glancy_____, whose address is _1801 Avenue of the Stars, Suite 311, Los Angeles, CA 90067_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: _____MAR - 3 2011_____

By: _____
CHRISTOPHER POWERS
Deputy Clerk

*(Seal of the Court)*

1181

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

Name & Address:
Lionel Z. Glancy (#134180)
GLANCY BINKOW & GOLDBERG LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
Telephone:  (310) 201-9150

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| VIVIAN R. DULBERG, Derivatively on Behalf of Herself and All Others Similarly Situated,<br><br>PLAINTIFF(S)<br><br>v.<br><br>FRANCO PLASTINA<br>[See Attachment for Additional Defendants]<br><br>DEFENDANT(S). | CASE NUMBER<br><br>**SACV11-00351 JVS (RNBx)**<br><br><br>**SUMMONS** |

TO:    DEFENDANT(S): THE ABOVE-NAMED DEFENDANTS

A lawsuit has been filed against you.

Within   21   days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, Lionel Z. Glancy                        , whose address is 1801 Avenue of the Stars, Suite 311, Los Angeles, CA 90067                        . If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: ___MAR - 3 2011___          By: ___**CHRISTOPHER POWERS**___
                                              Deputy Clerk

                                              *(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

## ATTACHMENT TO SUMMONS

ADDITIONAL DEFENDANTS:

WILLIAM H. EVERETT, GREGORY S. RUSH, MARK A. FLOYD, RONALD W. BUCKLY, HUBERT DE PESQUIDOUX, DAVID R. LAUBE, CAROL G. MILLS, KRISH PRABHU, AND MICHAEL R. RESSNER

-and-

NOMINAL DEFENDANT:

TEKELEC

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
VIVIAN R. DULBERG, Derivatively on Behalf of Herself and All Others Similarly Situated,

**DEFENDANTS**
FRANCO PLASTINA, WILLIAM H. EVERETT, GREGORY S. RUSH, MARK A. FLOYD, RONALD W. BUCKLY, HUBERT DE PESQUIDOUX, DAVID R. LAUBE, CAROL G. MILLS, KRISH PRABHU, MICHAEL R. RESSNER and

TEKELEC, Nominal Defendant

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

Lionel Z. Glancy (#134180)
Glancy Binkow & Goldberg LLP
1801 Avenue of the Stars, Suite 311, Los Angeles, CA 90067, T. (310) 201-9150

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff    ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant    ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes   ☒ No    ☐ **MONEY DEMANDED IN COMPLAINT: $** to be proved

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. §1332(a)(2) and 28 U.S.C. §1391(a) - Breach of Fiduciary Duty; Gross Mismanagement; Abuse of Control; Waste of Corporate Assets

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 630 Liquor Laws | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 640 R.R. & Truck | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 650 Airline Regs | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | IMMIGRATION | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | | | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:** Case Number: **SACV11-00351**

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a).  IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☑ No   ☐ Yes
If yes, list case number(s): _____

**VIII(b).  RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  ☑ No   ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)   ☐ A.  Arise from the same or closely related transactions, happenings, or events; or
                                ☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
                                ☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
                                ☐ D.  Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:**  (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | New York, NY |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | All Defendants - Morrisville, North Carolina |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
       **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County, CA | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

**X.  SIGNATURE OF ATTORNEY (OR PRO PER):**  _____     Date  March 3, 2011

   **Notice to Counsel/Parties:**   The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings
   or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed
   but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |